[Civ. No. 27669. Second Dist., Div. Two. July 23, 1964.]

LEACH CORPORATION, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

Smithers, Good, Potter, Wildman & Gregory, Paul W. Wildman, Baker, Ancel & Redmond and Mark Ancel for Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and A. R. Early, Deputy County Counsel, for Defendants and Respondents.

ASHBURN, J.*—Appeal from adverse judgment in action brought for recovery of ad valorem taxes paid under protest, action brought pursuant to section 5138, Revenue and Taxation Code. In effect it is a review of the action of the Board of Supervisors of Los Angeles County sitting as a board of equalization. (Const., art. XIII, § 9; *Southern Pacific Land*

*Retired Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.

*Co.* v. *County of San Diego,* 183 Cal. 543, 546 [191 P. 931].) Appellant sought to prove that its inventories and fixtures were assessed at a higher ratio of market value than real property in the same county, which would be a violation of the property owner's fundamental right to equality in taxation.

Appellant urges two points: (1) that it was denied procedural due process in the hearing before the board, and (2) that there was no substantial evidence to support the board's implied finding that appellant's property was assessed at a ratio to its fair market value no higher than the ratio prevailing throughout the county and on all kinds of property. First we consider the sufficiency of the evidence.

The assessment is presumed to be fair and lawful and the burden rested upon the taxpayer-plaintiff to prove the contrary. (*Wild Goose Country Club* v. *County of Butte,* 60 Cal.App. 339, 342 [212 P. 711]; *Merchants Trust Co.* v. *Hopkins,* 103 Cal.App. 473, 478 [284 P. 1072]; *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U.S. 350, 353 [38 S.Ct. 495, 62 L.Ed. 1154, 1156].) The question before this court is whether the record contains substantial evidence to support the implied findings of the board, not whether the evidence preponderates in that direction. (*City of Los Angeles* v. *County of Mono,* 51 Cal.2d 843, 851 [337 P.2d 465]; *A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471, 476 [9 Cal.Rptr. 67].) The presumption that the assessor did assess all properties fairly and upon an equal basis will sustain the board's implied finding to that effect unless that presumption is overthrown by evidence to the contrary. (*Western Union Telegraph Co.* v. *County of Los Angeles,* 160 Cal. 124, 126-7 [116 P. 564]; *People* v. *Siemsen,* 153 Cal. 387, 390 [95 P. 863]; 18 Cal.Jur.2d § 77, p. 504.)

Appellant called as witnesses Assessor John R. Quinn, Mr. Lawrence M. West, Chief of Business Division of the Assessor's Office and Chief of Business and Personal Property Appraisal, and Mr. Sorrentino, Deputy Assessor. The taxes involved are those for the year 1960-61.

Mr. Sorrentino prepared the assessments under attack but he was questioned about only one of eight such assessments. He testified:

"Personal property included in this assessment comprised many items, cash on hand, inventories, office equipment, fixtures and equipment, machinery, power wiring installed in

the building and tools. And all of these items, cash on hand was assessed at 50 per cent of the full amount of cash kept on hand. On the inventories, after making certain adjustments and eliminations and allowances, it was assessed at 50 per cent of the considered fair market value.

"On the other items, which are primarily equipment and machinery, office equipment, power wiring and tools, after making allowances for depreciation, aging them, making allowances to establish fair market value, they were assessed at 50 per cent of their considered fair market value. It listed the total property including all of these items for evaluation for this particular assessment at 18435 Susana Road, Compton, was assessed at $630,160.

"Of the equipment, a portion of this, the entire plant was inspected. The inventories were inspected and of the equipment it was considered that a portion of that was affixed to the building and should then be classified as straight fixtures. Of the $630,160, $35,380 was classified as straight fixtures. The balance was considered—the balance of $594,780 was then classified as personal property. . . . We started with a full inventory on their books and records of $2,616,425.

"MR. WILDMAN: Then, do I understand you correctly, that there was a deduction allowed?

"MR. SORRENTINO: Yes we eliminated certain items.

"MR. WILDMAN: And was there a percentage deduction used?

"MR. SORRENTINO: Well, after elimination of certain items, which were considered always having little or no value, such as termination claim inventories or in transit interstate which, of course, would not be tangible, further allowance was made of 10 per cent of the full value of the inventory to eliminate further obsolescence, price variations and errors in inventory. Then the balance was considered the fair market value and assessed at 50 per cent. . . .

"MR. SORRENTINO: Yes. The value of the inventory located at this main plant on Susana Road, the full cash value of it or full market value was estimated to be $1,047,480.

"MR. WILDMAN: The figures you just gave me for inventory were based upon the books and records of the petitioner Leach Corporation, is that correct?

"MR. SORRENTINO: Yes.

"MR. WILDMAN: With your examination?

"MR. SORRENTINO: With the books and records and physical examination.

"MR. WILDMAN: Right. Then, assuming that I asked you other questions about other items of personal property, your answer would be based upon the same examination, the books and records, is that correct?

"MR. SORRENTINO: Yes, this was all one complete examination."

Mr. West testified:

"Well, we assess the personal property at what is, in our opinion, 50 per cent of the fair market value of the property. Is that what you are after? . . .

"[MR. WILDMAN]: Now, when you say 50 per cent of the, I believe you said fair market value, is there any method or approach you use to get your opinion of what the market value is?

"MR. WEST: We use various approaches. In many instances, we use the books and records of the corporations as a guide. In other instances, where we do not have books and records available to use, we make a physical appraisal of the property.

"MR. WILDMAN: I see.

"In other words, you would, then, for instance, arrive at a market value and then you take 50 per cent of what your opinion is of the market value?

"MR. WEST: That is correct."

Mr. Quinn preceded these witnesses on the stand. Asked about a 1956 report of the Bureau of the Census, the following colloquy ensued:

"MR. QUINN: All I know about that census report is it says that I do the best job of equalization, if not foremost, of any other community of over 50,000 people in the United States of America. That is as far as I read.

"MR. WILDMAN: I understand. When you read that, you closed the book and threw it away.

"MR. QUINN: I didn't throw the book away, but I couldn't get it in the paper until a Dun & Bradstreet writer came out and said I was doing the best job in Los Angeles County that was done anywhere in the United States.

"MR. WILDMAN: I see. Congratulations, Mr. Quinn.

"Are you familiar—

"MR. DEBS [Supervisor]: Will you stipulate that he is doing the best job of anybody in the United States?

"MR. WILDMAN: I am afraid I can, Mr. Debs. With all due respect—

"MR. DEBS: I was afraid that you wouldn't."

"Mr. Wildman: No, I am afraid I can."[1]

The witness further testified:

"Mr. Quinn, do you have any information as to what the current ratio your office is using in regard to the average current ratio in regard to real property assessed within the County?

"Mr. Quinn: The Assessor of Los Angeles County assesses at 50 per cent of his opinion of market value.

"Mr. Wildman: That is precisely 50 per cent, is it?

"Mr. Quinn: That is what we endeavor to do. . . .

"Mr. Wildman: May I ask this one clarifying question, Mr. Quinn? Then you say you assess on the basis of 50 per cent of what you consider the full market value?

"Mr. Quinn: My opinion.

"Mr. Wildman: Right, your opinion.

"Following your opinion, if the taxpayer doubled the amount of the assessed evaluations indicated on the tax bill, that would be only your opinion?

"Mr. Quinn: That would be my opinion.

"Mr. Wildman: And that would be in regard to real property, is that correct?

"Mr. Quinn: That would be in regard to all property.

"Mr. Wildman: All property. It is all on a 50 per cent basis. . . .

"Mr. Wildman: Now, Mr. Quinn, do I understand you correctly that there is no difference in the assessment between real and personal property? It is all on the basis of 50 per cent, is that correct?

"Mr. Quinn: That is our intention."

Appellant neither produced nor offered any other evidence of the fair market value of the personal property and fixtures involved herein, either directly or through cross-examination.

Counsel for appellant now argues that the foregoing evidence lacks substantiality. That contention cannot be sustained. Market value necessarily is a matter of opinion. The foregoing evidence establishes that all property —real, personal and mixed—is assessed at 50 per cent of the market value placed upon it by the assessor.

---

[1] In the superior court Attorney Wildman denied the correctness of the board transcript as just quoted and asserted that he did not make those statements; but the original transcript presumably is certified as correct by the official reporter; no effort was ever made to have it corrected; it was brought before us by way of augmentation of the record upon the motion of appellant and we must accept it as correct.

■ This assessor had been in office many years, but it is now suggested that his opinion of market values is to be disregarded because no proper foundation was laid for the same. There are several answers to this claim. No objection to the qualification of the witness was made by appellant at any time before appeal, hence it comes too late. (*Bundy* v. *Sierra Lbr. Co.*, 149 Cal. 772, 775 [87 P. 622]; 19 Cal.Jur.2d § 295, p. 22.) "The qualification of a witness to state his opinion may be waived . . . by failure to object to the testimony when offered." (32 C.J.S. § 458, p. 99.) ■ Moreover these witnesses were called by plaintiff and counsel asked them for their conclusions without inquiring into their qualifications as experts; this necessarily amounted to a waiver of a showing of such expert knowledge. While plaintiff may not have been bound by the evidence of these presumptively adverse witnesses, their evidence is in the case to be valued for what it is worth. ■ This testimony, standing alone, is not only substantial evidence but is enough to sustain the judgment even in the face of a conflict. (See *City of Los Angeles* v. *County of Mono, supra,* 51 Cal.2d 843, 852; *A. F. Gilmore Co., supra,* 186 Cal.App.2d 471, 477-478.)

■ Appellant sought to establish its claim of use of different ratios by the testimony and affidavit of James O. Stevenson, Executive Director of Los Angeles Bureau of Municipal Research, a private corporation, concerning a study made by him in 1959, a year before the valuation date pertinent to this proceeding; this study led him to the conclusion that the ratio used for assessment of real estate was 20.419 per cent (ranging from 2 per cent to 86 per cent) as compared with 50 per cent on personalty. In that study he included sales that had occurred two and one-half years before the study or three and one-half years before the 1960 tax lien date. It covered 6,970 parcels out of some 1,732,101 properties alleged in respondents' brief to be on the secured roll, and it was confined to areas served by only seven realty boards—hardly representative of the county as a whole. None of these sales were verified by Stevenson or his staff through contacting buyer, seller or broker participating therein nor was any attention given to the terms of sale. The sales data were obtained from various realty boards, multiple listing services, and like sources. This evidence certainly cannot be said to balance or outweigh the testimony of Quinn, West and Sorrentino.

■ The Stevenson affidavit says: "Affiant has assembled

and collated all of the data used in this said survey into a booklet form and the same is marked Exhibit A and physically annexed hereto and all of the facts therein set forth are corporated herein by reference with the same force and effect as though set forth in length in this affidavit.''

Objections to that exhibit were sustained. It seems to be contended that this was substantial error. We have the court exhibits before us; Exhibit 1 is a copy of the affidavit just quoted but it has no booklet or other exhibit attached to it. Hence, we are unable to appraise this contention and must reject it; however, the record indicates that the exhibit would have to succumb to the same objections as the affidavit itself and be properly excluded as incompetent evidence.

Stevenson also relied upon a survey made in 1957 by a legislative committee known as the Coolidge Committee, which covered 1,710 parcels and resulted in a ratio of 18.6 per cent; also, a 1956 study of the Federal Bureau of the Census (Department of Commerce) which sampled 38,851 parcels of Los Angeles County property and resulted in a ratio of 18.5 per cent. Assessment for tax purposes is a continuous process which normally reflects many changes each year. It is not a static thing. (See *Southwest Land Co.* v. *County of Los Angeles,* 46 Cal.App. 9, 14-15 [188 P. 575]; *Rancho Santa Margarita* v. *County of San Diego,* 135 Cal. App. 134, 141 [26 P.2d 716]; *In re Ewa Plantation Co.,* 47 Hawaii 41 [384 P.2d 287, 290]; *Peck's Products Co.* v. *Bannister* (Mo.) 362 S.W.2d 596, 601.) The remoteness of the dates of sales and consideration of the limited number of parcels throws sufficient doubt upon these results to warrant, if not require, a holding that they do not possess sufficient substantiality and credibility to overthrow the implied finding of the board based upon the testimony of the assessor and his assistants.

It must be held that there is substantial evidence in the record to support the board's implied finding of fair and equal assessment of appellant's properties. The trial court so found.

Denial of procedural due process is claimed as the result of exclusion of certain evidence. Respondent seems to concede that exclusion of substantial material evidence by the board would amount to a denial of such due process in a tax equalization proceeding. (Cf. *Kaiser Co.* v. *Industrial Acc. Com,* 109 Cal.App.2d 54, 58 [240 P.2d 57]; *Evans* v. *Industrial Acc. Com.,* 71 Cal.App.2d 244, 248 [162 P.2d 488]; *Universal*

*Consolidated Oil Co.* v. *Byram*, 25 Cal.2d 353, 361 [153 P.2d 746].)

▮ Appellant's alleged grievance grows out of counsel's unsuccessful efforts to uncover certain preliminary tabulations of the ratio of assessed value to full cash value of locally assessable, tangible property in the various counties, which tabulations were made by the State Board of Equalization pursuant to sections 1817 and 1818, Revenue and Taxation Code.[2] Section 1818 concludes with the statement: "All such tabulations shall be open for inspection by all persons interested," and appellant claims to be such an "interested person." The relationship of this portion of section 1818 to other sections is important. Section 1817 provides: "The board shall annually estimate any change that may have occurred in the full cash value of locally assessable tangible property between the lien date of the roll for which the last survey was made pursuant to section 1815 and the lien date of the current roll. . . . " and specifies that this shall be done by the third Monday in July of each year and that a statement of the board's determination relating to his county shall be transmitted to each assessor. Section 1819 provides that not later than August 1 the board shall give the assessor a reasonable opportunity to examine and discuss with the board that portion of the tabulations affecting property in his county. Then it says: "After making any adjustment it deems appropriate as the result of such discussion, but not later than September 2d, the board shall make available for public inspection all such tabulations and shall publish the ratio of assessed to full cash value of locally assessable tangible property for each county."

During the examination of Assessor Quinn, the following occurred:

"MR. WILDMAN: My question is this: Pursuant to this

---

[2] § 1818. The board shall each year prepare tabulations showing for each county the ratio of assessed to full cash value of locally assessable tangible property. The tabulations shall show, in such a way as to prevent identification of individual parcels, the ratio of assessed to full cash value of each parcel of such tangible property in the sample of any survey in the county made in the last year pursuant to section 1815. The tabulations shall also show the derivation of the total full cash value of the locally assessable tangible property on the current roll from the total full cash value of the locally assessable tangible property on the roll of a prior year pursuant to section 1817. All such tabulations shall be open for inspection by all persons interested.

section I just read, it provides that you are to receive this information from the State Board shortly after the third Monday in July. My question is, did you receive this information from the State?

"MR. EARLY: I object to that as immaterial. You will find, counsel, that section 1819 provides that not later than September 2nd the State may release that information to the public.

"MR. WILDMAN: I agree with you that it may release. I am not asking what the information is. I am asking if he did receive the information.

"MR. EARLY: What does that have to do with your clients' assessment in this case? My objection is it is completely irrelevant whether or not Mr. Quinn has received a certain notification from the State Board of Equalization."

The objection was sustained and the evidence excluded. Counsel for appellant went no further; did not attempt to force production of the document or to otherwise gets its contents before the board; but the subject had been ruled out and the question remains whether appellant is one of the "persons interested" as that phrase is used in section 1818 or whether it must wait for inspection until the final tabulation is made available for public inspection under section 1819.

Departmental Regulation 2703 provides[3] that during the period between transmittal of estimates pursuant to section 1817 and the 1st of September said tabulations "pertaining to the county are open to and available for inspection during regular business hours at the office of the board in Sacramento, by the county assessor, any deputy assessor designated by him, any official or employee of the county designated by the board of supervisors and any official or employee of a taxing agency within the county designated by its governing body."

Regulation 2705 says: "After making any adjustments it deems appropriate as the result of the discussion, but not later than September 2d, the tabulations pertaining to all counties shall be available for public inspection during regular business hours at the offices of the board in Sacramento."

■ *Meyer* v. *Board of Trustees,* 195 Cal.App.2d 420, 431 [15 Cal.Rptr. 717]: "The contemporaneous construction

[3]Portions of State Board of Equalization regulations for equalization proceedings, found in Appendix "B" to respondents' brief, page 2 thereof.

of a statute by those charged with its enforcement and interpretation, although not necessarily controlling, 'is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' [Citations.] As a contemporaneous construction, and because he was charged with the duty of rendering an opinion with respect to its meaning, the interpretation of the subject statute by the attorney general in 1936 is entitled to great respect. [Citations.] ''

█ The matter seems satisfactorily clarified by an interdepartmental communication of May 25, 1960, addressed to the Secretary of the State Board of Equalization and prepared by Assistant Attorney General Dan Kaufmann. (Appendix ''A'' to respondents' brief.[4]) It says in part: ''The legislative intent is clearly to provide the assessors with a reasonable opportunity for examination and discussion. Obviously, tabulations must be completed prior to the time of the discussions. The task of preparing the tabulations is an extensive one. If the board had to furnish the results to the assessors and afford the assessors an opportunity for examination and discussion before August 1st the time element would be such that it is extremely doubtful the assessors could be afforded a reasonable opportunity for examination and discussion. On the other hand, if the tabulation must be completed by August 1st, but need not be available for public inspection before September 2d, the legislature has provided at least a 32 day period in which a reasonable opportunity for examination and discussion exists. This is the only reasonable construction of the section.

''4. Section 1818 provides that all tabulations prepared by the board as required by this provision of the law 'shall be open for inspection by all persons interested.' On the other hand, section 1819 specifically provides that 'not later than September 2d' the board shall make available *for public inspection* all such tabulations. Section 1818 does not provide for public inspection, but merely for inspection by all persons interested. Moreover, the tabulations prepared under section 1818 are preliminary in nature because they are subject to adjustment under the provisions of section 1819 after discussions with the assessors. It is the completed tabulation which is ultimately made available for public inspection, and

---

[4]The fact that this is not a published opinion does not detract from its logic.

according to the express terms of section 1819 this must be done not later than September 2d.''

There was no error in the court's ruling upon this inquiry.

The judgment is affirmed.

Herndon, Acting P. J., and Roth, J., concurred.

A petition for a rehearing was denied August 17, 1964, and appellant's petition for a hearing by the Supreme Court was denied October 7, 1964.