Filed 5/8/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **FRANK CAFFERKEY et al.,** <br>     **Plaintiffs and Appellants,** <br> **v.** <br> **CITY AND COUNTY OF SAN FRANCISCO,** <br>     **Defendant and Respondent.** | **A140752** <br><br> **(San Francisco County** <br> **Super. Ct. No. CGC-11-515538)** |

The San Francisco Assessor-Recorder's Office (Assessor-Recorder) assesses taxable property within the county and records legal documents. (Gov. Code, § 27231; Rev. & Tax. Code, § 401.)[1] The Assessor-Recorder maintains two different sets of maps in its office: (1) assessor's maps or block book maps, which are used to locate and identify property for tax assessment purposes (assessor's maps); and (2) subdivision maps or parcel maps, which are used to lease, sell, or finance property (parcel maps).

This appeal arises out of a dispute regarding the property tax assessment of property owned by Frank and Maureen Cafferkey (collectively, Cafferkeys) in San Francisco's Potrero Hill neighborhood. The Cafferkeys received a property tax bill for APN 28-4329-18 (Lot 18),[2] which appears on assessor's maps but not on any parcel

---

[1]     Unless noted, all further statutory references are to the Revenue and Taxation Code.

[2]     "APN" — which stands for assessor's parcel number — is a numerical identifier associated with a particular piece of property for property tax assessment purposes. (State Board of Equalization, Assessors' Handbook Section 215, Assessment Map Standards for Manual Systems (April 2010), p. 26 (Assessors' Handbook.) Assessors' Handbooks are "a 'primary reference' . . . and 'basic guide' . . . for assessors."

1

maps.  The Cafferkeys paid the property taxes, but later filed a claim for a property tax refund, claiming the property taxes for Lot 18 were "erroneously and illegally collected" under section 5096, subdivision (b) because that property "does not exist" on the relevant parcel maps.  The San Francisco Assessment Appeals Board (Board) denied the Cafferkeys' claim, concluding the Assessor-Recorder's numbering and identification of parcels for property tax purposes is independent of the numbering of parcels for subdivision purposes and that Lot 18 "exists for property tax purposes" on the assessor's maps.

The Cafferkeys filed a complaint for a property tax refund in the superior court against the City and County of San Francisco (City).  The court denied the Cafferkeys' motion for summary judgment, concluding the Cafferkeys "failed to show that, as a matter of law, a discrepancy between" the parcel maps and the assessor's maps "mandates a refund of assessed taxes."  The court granted the City's motion for summary judgment.  It determined the City "produced evidence showing it has the authority to assess taxes based" on the assessor's maps and the Cafferkeys "failed to show the existence of a material issue of fact."  The court entered judgment for the City.

The Cafferkeys appeal.  They contend they are entitled to a property tax refund because the City created Lot 18 "by mistake" and not in accordance with section 327, which specifies requirements for identifying property on assessor's maps.  They also contend the court erred by granting summary judgment for the City because there are triable issues of material fact regarding the authenticity of the assessor's maps, and whether assessor's maps are actually distinct from parcel maps.

We affirm.  We conclude the Assessor-Recorder created Lot 18 pursuant to its authority under section 327, and the Cafferkeys have failed to raise an issue of fact as to

---

(*Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1155, citations omitted.)  "'[A]ssessors' handbooks are not regulations and do not possess the force of law . . .'" but courts have relied on them when resolving property tax disputes. (*SHC Half Moon Bay, LLC v. County of San Mateo* (2014) 226 Cal.App.4th 471, 485; *Elk Hills Power, LLC. v. Board of Equalization* (2013) 57 Cal.4th 593, 620-621.)

whether the assessor's maps comply with that statute. As a result, the taxes for Lot 18 were not "[e]rroneously or illegally collected" (§ 5096, subd. (b)) and the Cafferkeys are not entitled to a tax refund.

FACTUAL AND PROCEDURAL BACKGROUND

In 1999, the Cafferkeys purchased real property in San Francisco bordered by Vermont, 26th, and Army (later renamed Cesar Chavez) Streets, then known as APN 28-4329-15 (Lot 15). The 1999-2000 Assessor-Recorder's property tax roll recorded Lot 15 at a reassessed value of $850,000, and with a street address of 2550 Army Street, San Francisco, California. In 2000, the Cafferkeys recorded a parcel map (2000 parcel map) changing the lot number for Lot 15 from APN 28-4329-15 to APN 28-4329-17 (Lot 17). The 2002-2003 Assessor-Recorder's property tax roll divided Lot 15 for property tax purposes into Lots 17 and 18.[3] The Assessor-Recorder prepared and recorded an assessor's map describing Lot 18 for property tax assessment purposes at Pages 4329, 4327A Sheet 2, and 4327A Sheet 3 of Volume 28 of the assessor's map books.

In 2003, the Cafferkeys recorded another parcel map (2003 parcel map) subdividing Lot 17 into 10 lots — APN 28-4329-19 through APN 28-4329-28 (collectively, Lots 19 through 28). The Cafferkeys built one condominium on each of those lots.[4] The 2004-2005 Assessor's property tax roll divided Lot 17 into Lots 19 through 28.

In 2003, the Cafferkeys received property tax bills for Lot 18, bearing the address 2550 Cesar Chavez Street, San Francisco, California. Lot 18 is not depicted on the 2000 or 2003 parcel maps. The Cafferkeys paid certain property taxes for Lot 18. From 2003

---

[3]     When the Cafferkeys recorded the 2000 parcel map, they intended to divide Lot 15 into two lots: Lots 17 and 18. Their title company, however, informed them "it could not issue a title policy insuring the property if it was divided into two lots, because one of the lots would [be] 'land-locked,' i.e., it would not have street access." As a result, the Cafferkeys recorded the 2000 parcel map "which did not divide [Lot] 15 into two lots, but only renumbered it as [Lot] 17."

[4]     The Cafferkeys also own six adjacent lots on 26th Street, but that property is not at issue in this appeal.

to 2009, the Cafferkeys received additional property tax bills for Lot 18, but did not pay them.  The Cafferkeys believed "the bills were being sent to [them] in error" because Lot 18 was not a parcel number for any of their properties, and the physical address for Lot 18 was not the address for any of their properties.  In 2009, the Cafferkeys received a notice of tax sale for Lot 18.  To avoid the sale, the Cafferkeys negotiated an installment agreement and paid the back taxes for Lot 18, and the property taxes for tax year 2010-2011.  From 2009 to 2012, the Cafferkeys paid $390,027.90 in property taxes for Lot 18.

*The Cafferkeys' Property Tax Refund Claim*

In 2010, the Cafferkeys filed an application for changed assessment, which served as a claim for property tax refund.  The Cafferkeys argued the property taxes for Lot 18 were "[e]rroneously and illegally collected" because that property did "not exist" on the 2000 or 2003 parcel maps.  They sought a refund of $152,823.99 in property taxes and interest for tax years 2003 through 2010.  They alleged the value of Lot 18 was $0 because it "has never existed."

At a March 2011 hearing before the Board on the timeliness of the tax refund application, the Assessor-Recorder's Chief Appraiser, Matthew A. Thomas,  offered "some context" on the nature of the dispute.  He explained, "this was due to a parcel split and there was, I believe, a clerical error involved. . . . Basically, what happened was there was a [Lot] 15.  It was supposed to become just renamed [Lot] 17. [¶] What happened was that [Lot] 15 became 17 and 18.  And so the value for [Lot] 15 was split into 17 and 18.  The taxpayer received bills going back to 2003 . . . for both [Lots] 17 and 18.  They paid 17.  They didn't pay 18.  We have met a few times.  We've shown the taxpayer that there has not been an over assessment. . . . They just have been receiving bills since 2003 and not paying them.  And now . . . in 2010, they're bringing it to our attention."  Thomas also explained the net assessment of the Cafferkeys' property "is correct in that the taxes they've been billed were correct."[5]

---

[5]     The Cafferkeys tried — diligently but unsuccessfully — to resolve their dispute outside the assessment appeals process.  During these discussions, counsel for the

4

The Board rejected the Cafferkeys' tax refund application for 2003 through 2009 as "untimely" but accepted their application for 2010 and held hearings on the merits in July and September 2012. At the September 2012 hearing, counsel for the Cafferkeys explained, "the only issue presented . . . is whether this Lot 18 exists. The recorded documents indicate that it does not." Counsel argued the taxes for Lot 18 had been "erroneously levied because Lot 18 simply doesn't exist" on the 2000 or 2003 parcel maps and "the tax bills [should] actually reflect the existing lots" on the parcel maps. Counsel for the Assessor-Recorder urged the Board to deny the Cafferkeys' tax refund application because the assessor's maps described Lot 18 for property tax assessment purposes. Counsel contended the Cafferkeys failed "to understand the difference between property descriptions for purposes of the San Francisco Subdivision Code and for purposes of property tax assessment. They are not the same. . . . [Lot 18] does, in fact, exist for the relevant purpose of property tax assessment." As counsel explained, "[t]he fact that there is no subdivision lot described on a . . . parcel map . . . as . . . Lot 18 does not mean that . . . Lot 18 does not represent taxable, real property for property tax assessment purposes. Nor does it mean that [Lot 18] does not exist." Counsel argued sections 321 and 327, and provisions of the San Francisco Administrative Code, authorize the assessor to number a parcel for tax assessment purposes differently from a parcel number listed on a parcel map.

A Board member asked whether "a reasonable person looking at [the] tax bills, or looking at the parcel maps before and after the changes [could] say, 'Oh yeah. There may not be an 18, but if you just look at this, it's basically the same property.'" The Assessor-Recorder's counsel responded, "Yes because the configuration of the property is so unique. How could you miss it? It's a curved swath. And that paid under [Lot] 15 for several years at a factored base year value in the $800,000 to $900,000 range. . . . [¶] [S]o all you would have to do is read your tax bill for the first year of [Lot] 17 to [Lot] 18 to see what had occurred. Half of the land value was on [Lot] 17 and half of it was on

Cafferkeys urged the Assessor-Recorder to cancel Lot 18 and reissue supplemental and escape assessments for Lots 19 through 28. The City declined to do so.

5

[Lot] 18.  Both addresses were 2550 Cesar Chavez.  Both tax bills got paid. . . . [N]obody was confused."  Counsel continued, "[Lot] 18 . . . includes 49.7% of the factored base year value of the land and 49.7 of the value of the improvements that were originally assessed at $4 million. . . . Lots 19-28 have the other 50.3% of both the land and the condominiums, apportioned according to the percentages allocated to each condominium."

At the conclusion of the hearing, the Board denied the Cafferkeys' 2010 tax refund application.  In its findings of fact and statement of decision, the Board determined the Cafferkeys did not satisfy their burden to establish the fair market value of Lot 18 was lower than the enrolled factored base year value.  As the Board explained, "the Assessor holds certain legal authority to identify real property parcels and assess the land and improvements on those parcels for property tax purposes utilizing the property tax roll, and did so in this instance.  The Assessor's numbering and identification of parcels for property tax purposes is independent of the numbering of parcels and/or description/dimensions of that land and improvements recorded with the County Recorder pursuant to the California Subdivision Map Act and/or the City's Subdivision Code.  Thus, identification of real property for property tax purposes need not track or duplicate identification of that property for subdivision purposes.  [T]his distinction . . . is well recognized in the law."  The Board rejected the Cafferkeys' argument that the Assessor-Recorder "is precluded from assigning and utilizing parcel numbers for property tax purposes, when the same land has had other parcel numbers separately recorded under the California Subdivision Map Act and/or the City's Subdivision Code."  Finally, the Board concluded Lot 18 "exists for property tax purposes" on the assessor's maps.

*The Cafferkeys' Superior Court Action for Property Tax Refund*

The Cafferkeys filed an action for a property tax refund against the City in the superior court.  Their operative verified first amended and supplemental first amended complaint sought a refund of taxes (including interest and penalties) paid for Lot 18 from 2003 to 2009 and for 2010 and all subsequent years, and a judicial declaration they were

6

not obligated to pay future taxes for Lot 18. As they did in their administrative claim, the Cafferkeys alleged the City "improperly and illegally assessed the property taxes" for Lot 18 because that property "does not exist and indeed, never existed." The Cafferkeys also alleged they were entitled to a refund for taxes paid for Lot 18 because the property tax assessments for that property were "wholly void" and "a nullity as a matter of law." The operative complaint did not allege the City created Lot 18 "by mistake" or pursuant to "clerical error[,]" nor identify any purported deficiencies in the assessor's maps.

*The Parties' Cross-Motions for Summary Judgment*

Both parties moved for summary judgment. In their motion for summary judgment, the Cafferkeys claimed they were entitled to a property tax refund because: (1) Lot 18 does not appear on any parcel maps and is therefore "non-existent[;]" (2) Lot 18 became part of the assessor's roll "due to a mistake by the Assessor-Recorder's Office[;]" and (3) the assessor's maps do not comply with section 327.

Maureen Cafferkey's supporting declaration detailed the procedural history underlying the dispute over the assessment of Lot 18. According to Maureen, Thomas "agreed to cancel the old tax bills for [Lot 18] due to the Assessor's clerical error. . . ." Maureen's declaration attached various documents, including the parcel map for Lot 15, and the 2000 and 2003 parcel maps. In her supporting declaration, the Cafferkeys' attorney, Michelle Akerman, averred Lot 18 does not appear on the Assessor-Recorder's "'SF Parcel' website" or "'San Francisco Property Information Map' website[.]" Akerman also described the Cafferkeys' unsuccessful attempts to settle the dispute, and the relevant Board hearings. According to Akerman, a "Deputy City Attorney" told her in a telephone call "that it appeared to her that the property taxes for [Lot 18] were due to a clerical error, and that therefore, the Cafferkeys were entitled to a refund of penalties on the purported back taxes. . . ." The Cafferkeys claimed Thomas and the unnamed deputy city attorney's statements that there was a "clerical error" constituted an admission that the Assessor-Recorder erred in the creation of Lot 18.

In its motion for summary judgment, the City argued the Cafferkeys were not entitled to a tax refund because Lot 18 "exist[ed] for tax assessment purposes." The City

7

explained the difference between assessor's maps — which are used for property tax purposes — and parcel maps — which are not, and noted descriptions of property in parcel maps "have no legal effect in describing property for property tax assessment purposes. . . . For tax assessment purposes, it is the description of the property assigned by the county assessor that controls." The City contended "the property on which the taxes were assessed is legally described as '. . . Lot 18' on maps prepared in accordance with applicable state and local laws pertaining to property tax assessments," and as result, Lot 18 "exists for property tax assessment purposes." In a supporting declaration, Thomas described the difference between assessor's maps and parcel maps and averred the 2000 and 2003 parcel maps are not "used for property tax assessment purposes." Thomas's declaration attached the relevant assessor's maps and sections of the Assessors' Handbook.

In opposition, the Cafferkeys argued they were entitled to a property tax refund and the City was not entitled to summary judgment because the Assessor-Recorder created Lot 18 "by mistake" and because Lot 18 "is the product" of the Assessor-Recorder's "clerical error." As the Cafferkeys explained, the Assessor-Recorder may not create parcels "whenever and however it pleases; there are specific enumerated methods by which an assessor *must* describe property for property [tax] assessment purposes, and these methods do not include mistakenly creating extra assessor's parcels." The Cafferkeys also argued the assessor's maps did not comply with section 327 because they failed to "readily disclose what land is being assessed[.]" To support this argument, the Cafferkeys relied on excerpts from Thomas's deposition where he stated the "[a]ssessor's maps . . . reflect the intent of the taxpayer[,]" the Assessor-Recorder creates maps "'off of'" parcel maps recorded by the taxpayer, and that he "believe[d]" assessor's maps and parcel maps "are the 'same thing.'"[6]

In reply, the City argued Lot 18 was not created by "mistake" or as a result of "clerical error" under section 51.5, subdivision (f)(2). The City also argued Lot 18 was

---

[6] At Thomas's deposition, counsel for the Cafferkeys often used the term "map" without specifying assessor's map or parcel map, which seemed to confuse Thomas.

not "vague and indefinite" because the assessor's maps "indicate[ ] the location and boundaries of Lot 18."

Following a hearing, the court granted the City's motion for summary judgment and denied the Cafferkeys' motion. The court concluded the Cafferkeys failed to show as a matter of law "a discrepancy between" the parcel maps and the assessor's maps "mandates a refund of assessed taxes." The court also determined the City "produced evidence showing it has the authority to assess taxes based on" assessor's maps and the Cafferkeys "failed to show the existence of a material issue of fact." The court entered judgment for the City. The trial court denied the Cafferkeys' new trial motion and they timely appealed.

DISCUSSION

The Cafferkeys contend the court erred by granting the City's motion for summary judgment and denying their motion for summary judgment. "The standard of review for an order granting or denying summary judgment is de novo. . . . In determining whether the parties have met their respective burdens, we consider 'all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports.' [Citation.] We view the evidence in the light most favorable to [the Cafferkeys] as the parties opposing summary judgment, strictly scrutinizing [the City's] evidence in order to resolve any evidentiary doubts or ambiguities in [the Cafferkeys'] favor. [Citation.]" (*Dammann v. Golden Gate Bridge, Highway, & Transportation Dist.* (2012) 212 Cal.App.4th 335, 340-341.)

To place the issues in context, we review general principles related to identifying real property for tax assessment purposes.

I.

*Role of Assessor-Recorder, Assessor's Maps, and Parcel Numbers*

The Assessor-Recorder is comprised of the assessor — which identifies, inventories and appraises taxable property within the county and places it on the tax rolls — and the recorder, which maintains maps and other papers deposited in its office. (§

9

401; Gov. Code, §§ 24000, subds. (g), (j), 27231; S.F. Charter, § 6.101.)  The assessor assesses "all the taxable property in the county, other than state-assessed property, to the persons owning, claiming, possessing, or controlling it at that time. . . ."  (51 Cal.Jur.3d (2015) Property Taxes, § 111, p. 220, fn. omitted.)  The assessor places this information on the county assessment roll.  (9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 237, pp. 357-358 (Witkin).)  The tax assessment roll must contain "certain specified information" (*Statewide Homeowners, Inc. v. Williams* (1973) 30 Cal.App.3d 567, 570) and must "clearly designate[ ] the property assessed."  (Assessors' Handbook, *supra,* p. 1; see also § 602.)  The description of the property must enable the taxpayer to "ascertain with certainty what property is assessed to him or her, and whether it is properly valued."  (Witkin, *supra,* § 237, at p. 357; see also Ehrman & Flavin, Taxing Cal. Property (4th ed. 2014) § 12.1, pp. 12-2-12-3, § 12:18, p. 12-31 (Taxing Cal. Property).)

Sections 321 to 328 authorize methods to describe real property for tax assessment purposes.  (§ 321 ["[l]and shall be legally described for tax purposes pursuant to this chapter"].)  "The most common means of description is by parcels on assessors' maps." (Taxing Cal. Property, *supra,* § 12:18, p. 12-31.)  It is a "matter of common knowledge" that assessor's maps are used "in matters of taxation of real estate."  (*Schainman v. All Persons* (1929) 96 Cal.App. 753, 757.)  Section 327 — which governs the use of assessor's maps — provides in relevant part: "[w]here any . . . county officer possesses a complete, accurate map of any land in the county, or whenever such a complete, accurate map has been made in compliance with [Government Code] Sections 27556 to 27560 . . . the assessor may number or letter the parcels in a manner approved by the board of supervisors."[7]  (§ 327.)  Section 327 authorizes the assessor to "renumber or reletter the parcels or prepare new map pages for any portion of such map to show combinations or divisions of parcels in a manner approved by the board of supervisors, so long as an

---

[7]     Government Code sections 27556 to 27560 describe the county surveyor's duties when preparing assessor's maps.

inspection of such map will readily disclose precisely what land is covered by any particular parcel number or letter in the current or any prior fiscal year. . . ."

"An 'assessment parcel' of land is an area of land in one ownership and one general use. A parcel shows land area as it is actually owned and used rather than as it may have been plotted on subdivision or other maps. It is an area of land that in the opinion of the assessor should be included under one description for assessment purposes after consideration of all legal factors. [¶] A parcel may have been conveyed by one deed or by several deeds, and it may contain several lots or fractions of lots." (Assessors' Handbook, *supra,* p. 24.) "For simplicity, the parcel number should automatically refer to an assessor's map and to a particular parcel of land on that map." (*Id.* at p. 25.)

Descriptions of property in parcel maps have no legal effect for property tax assessment purposes. Unlike assessor's maps — which are used to assess property — parcel maps are used to sale, lease, or finance property. (*Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 652; see also S.F. Subd. Code, § 1304, subd. (a) [parcel maps are required to "offer to sell or lease, contract to sell or lease, or sell or lease any subdivision"].) Parcel numbers assigned pursuant to section 327 need not correspond with actual subdivisions, lots, tracts or other legal divisions or boundaries of land: the Assessor's "function is 'to raise revenue and not to regulate the division of land' and . . . he 'will quite often combine or renumber parcels for valid reasons entirely separate from the purpose of the Subdivision Map Act.'" (62 Ops.Cal.Atty.Gen. 147, 149 (1979); see also 59 Ops.Cal.Atty.Gen. 581 (1976) [assessor may combine several subdivision lots into a single parcel for tax assessment purposes].) The description of property in the assessor's maps controls for tax assessment purposes: the Assessor-Recorder is not required to use a parcel map for tax purposes. (S.F. Admin. Code, §§ 10.70-10.71.)

## II.

*The Assessor-Recorder Created Lot 18 Pursuant to 327 and the Description of Lot 18
in the Assessor's Maps Complies with that Statute*

In the proceedings below, the Cafferkeys claimed the property taxes for Lot 18 were erroneously collected because that property "did not exist" on the 2000 or 2003 parcel maps. On appeal, the Cafferkeys take a slightly different tack: they claim they are entitled to a property tax refund because the creation of Lot 18 was the result of a "clerical error" and because the City created Lot 18 "by mistake," and not pursuant to its authority under section 327. These arguments are premised on: (1) statements Thomas apparently made during meetings with the Cafferkeys and his statement at the March 2011 Board hearing that the Assessor-Recorder created Lot 18 due to a "clerical error[;]" and (2) a concession purportedly made by the Assessor-Recorder's counsel at the September 2012 Board hearing that the Assessor-Recorder created Lot 18 "by mistake."

Section 51.5, subdivision (f)(2) defines "clerical error" as "only those defects of a mechanical, mathematical, or clerical nature, not involving judgment as to value, where it can be shown from papers in the assessor's office or other evidence that the defect resulted in a base year value that was not intended by the assessor at the time it was determined." The Cafferkeys' reliance on an incomplete quotation from the March 2011 Board hearing does not demonstrate the creation of Lot 18 was due to "clerical error[.]" Thomas initially stated he "believe[d]" there was a "clerical error" but he then explained: "What happened was that [Lot] 15 became 17 and 18. And so the value for [Lot] 15 was split into 17 and 18. The taxpayer received bills going back to 2003 . . . for both [Lots] 17 and 18. They paid 17. They didn't pay 18. We have met a few times. *We've shown the taxpayer that there has not been an over assessment. . . .* [¶] They just have been receiving bills since 2003 and not paying them. And now . . . in 2010, they're bringing it to our attention." (Italics added.) Thomas also explained the net assessment of the Cafferkeys' property was "correct in that the taxes that they've been billed were correct."

A careful reading of Thomas's *entire* statement at the March 2011 Board hearing demonstrates there was no such clerical error — there was no "defect [that] resulted in a

12

base year value that was not intended by the assessor at the time it was determined." (§ 51.5, subd. (f)(2).) The City intended to split the base year value of the property between Lot 18 and Lots 19 through 28. In their opening brief, the Cafferkeys do not cite section 51.5 or explain how the so-called error was a "clerical error." The Cafferkey's belated attempt — in their reply brief — to establish the creation of Lot 18 was somehow due to a "clerical error" is not persuasive.

We also reject the Cafferkeys' claim that counsel for the Assessor-Recorder conceded at the September 2012 Board hearing that Lot 18 was created "by mistake." At the hearing, counsel for the Assessor-Recorder persuasively argued the City created Lot 18 pursuant to its authority under the Revenue and Taxation Code and the San Francisco Administrative Code. She explained: "It cannot be seriously disputed that a portion of the . . . property is described for assessment purposes as . . . Lot 18 . . . [¶] [t]he fact that the [Cafferkeys] refuse[ ] to recognize these assessor's [ ] maps, which are prepared under the authority of . . . Section 321 and the San Francisco Administrative Code as somehow not being official records is untenable. It's incredible. . . [A]ny contention that [Lot 18] does not exist should be disregarded. It's based on a fundamental misunderstanding of what an assessor's map is." The Cafferkeys have offered no cogent argument as to how a "mistake" in the Assessor-Recorder's choice of assigning parcel numbers violated sections 321 or 327. Even if we assume for the purposes of argument the Assessor-Recorder created the Lot 18 pursuant to a "clerical error" or "by mistake," the Cafferkeys have failed to show the existence of a disputed *material* fact. The City is entitled to collect property taxes on parcels identified on assessor's maps, even if those parcels are labeled with an incorrect lot number, so long as the parcel is clearly identifiable. (§ 327.)

In the alternative, the Cafferkeys contend there is "overwhelming" evidence the assessor's maps fail to accurately describe the property to be taxed as required by section 327. This argument fares no better. As stated above, section 327 requires an assessor's map to "readily disclose precisely what land is covered by any particular parcel number or letter in the current or any prior fiscal year." A description of real property on an

13

assessor's map is sufficient "when the owner is enabled to identify the land which is assessed without being misled by the description." (*E.E. McCalla Co. v. Sleeper* (1930) 105 Cal.App. 562, 567 (*E.E. McCalla*); see also *Biaggi v. Phillips* (1942) 50 Cal.App.2d 92, 98.)  Here, the description on the assessor's map is sufficient to identify Lot 18 for assessment purposes.  The Assessor's Parcel Number for Lot 18 is "APN 28-4329-18."  The number 28 refers to the volume of the assessor's map book.  The number 4329 refers to the block, and the number 18 refers to the lot shown on the pages of volume 28.  (*E.E. McCalla, supra,* 105 Cal.App. at p. 566 [assessor's map contained a description of the land and an identification of the various subdivisions, which was "sufficient to enable one to accurately determine and define the particular land which was assessed"]; see also *Mallman v. Kneeben* (1936) 11 Cal.App.2d 484, 486 ["[t]here can be no doubt that the description given here with reference to the map was adequate to identify and locate the land with certainty"]; *Morton v. Sloan* (1929) 96 Cal.App. 747, 749 [property description "could be readily ascertained by reference to the assessor's" map].)

To support their claim that it is "utterly impossible" to determine what property the City seeks to assess as Lot 18, the Cafferkeys rely on *Sinai v. Mull* (1947) 80 Cal.App.2d 277 (*Sinai*).  In that case, the taxpayer received property tax assessments and notices of delinquency and tax sale describing the property at issue as a "'Fraction of lot in Tahoe Vista , Sub'd. fr. 60, Block I (Eye), and improvements, described in Book 270, page 170, Placer County Records.'"  (*Id.* at p. 278.)  The deed describing the property, however, was recorded in Book 270, page 173 of the Placer County Records.  (*Ibid.*)  After the property was sold in a tax sale, the taxpayer sued to quiet title on the grounds the assessments, notices, and tax deed did not sufficiently identify the property.  (*Id.* at pp. 278-279.)  The trial court entered judgment for the taxpayer and the appellate court affirmed.  It concluded "[t]he description of the property appearing in the tax proceedings and deed . . . is fatally defective.  It is indefinite and uncertain.  It is impossible to determine what portion or 'fraction' of lot 60, block I of Tahoe Vista Subdivision was vested with a tax lien.  The references in the tax levy, the notice and the deed to a *fraction* of lot 60, block I of Tahoe Vista Subdivision, as "'described in Book 270, page 170,

14

Placer County Records,'" throw no light on the subject. That description covers twenty-nine designated lots in block I, belonging to The Sherman Company, including lot 60. No fractions of lots are mentioned in that description." (*Id.* at p. 279.)

Here and in contrast to *Sinai,* the assessor's maps depicting Lot 18 is not indefinite or uncertain. It identifies the specific lot with particularity, as APN 28-4329-18, and clearly discloses its location. The Cafferkeys originally purchased Lot 15, which eventually became Lots 17 and 18. The Cafferkeys do not deny owning Lot 18, and they admit they intended to split Lot 15 into Lots 17 and 18 when they recorded the 2000 parcel map.[8] At oral argument, counsel for the Cafferkeys eventually acknowledged Lots 17 and 18 on the assessor's maps correspond to Lot 15. Moreover, Lot 18 retained the same address as Lots 15 and 17 — 2550 Cesar Chavez Street, San Francisco, California. As a result, the Cafferkeys were "not misled by the description" of Lot 18 in the assessor's maps and should have been "able to identify and locate each separate tract" assessed to them. (*E.E. McCalla, supra,* 105 Cal.App. at p. 569.)

According to the Cafferkeys, the assessor's maps are "not accurate" in violation of section 327 because "they show ten condominium units on an area that is actually an empty, land-locked drainage swale, and show an empty lot in the area actually occupied by ten condominiums." This argument is premised on a comparison between the assessor's maps on one hand and parcel maps on the other. As we have explained, assessor's maps need not correspond to parcel maps and the description of property in the assessor's maps is what controls for property tax assessment purposes.

The Cafferkeys also contend the assessor's maps are "not complete" in violation of section 327 because they "fail to show any boundary line between [Lot 18] and the adjacent parcel[.]" This argument fails because the Cafferkeys did not raise it in the trial court. The operative complaint contains no allegations regarding the sufficiency of the assessor's maps: it simply alleges the City "illegally assessed the property taxes for [Lot

---

[8]     As stated above, it was only when their title company refused to insure a property without street access that the Cafferkeys decided to renumber Lot 15 as Lot 17 instead of dividing Lot 15 into Lots 17 and 18.

15

18] because [Lot 18] does not exist and indeed, never existed." The Cafferkeys did not raise this issue in their motion for summary judgment, nor in opposition to the City's motion for summary judgment. Under the circumstances, we decline to consider this argument, raised for the first time on appeal. (*NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1237.) "The general rule is that defendants 'should not be required to defend for the first time on appeal against a new theory that "contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial." [Citation.]' [Citation.] The proper forum for initial consideration of this claim was the trial court — [the Cafferkeys] may not raise it for the first time here." (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 221-222, fn. 15.)

At oral argument, counsel for the Cafferkeys relied on *Smith v. City of Los Angeles* (1910) 158 Cal. 702 (*Smith*). *Smith* concerned the sufficiency of an assessor's map prepared under former Political Code section 3658, which "provides for maps and plat-books to be kept by the assessor, which are required to show the private lands owned or claimed in the county, and are required to be in forms prescribed by the state board of equalization." (*Southwest Land Co. of Los Angeles v. Los Angeles Co.* (1920) 46 Cal.App. 9, 11; *Smith, supra,* at p. 704.) The California Supreme Court determined the assessor's map at issue did not comply with former Political Code sections 3650 and 3658 because the land had not been surveyed by the government or by the property owner and, as a result, the lines drawn on the map were "arbitrary" and "the location of the tracts indicated cannot be ascertained." (*Smith, supra,* at p. 705.)

*Smith* has no application here. It stands for the proposition that "if land has not been divided by proper governmental survey, an attempt to describe it in an assessment roll by governmental subdivisions is invalid." (84 C.J.S. Taxation, § 691, p. 612, fn. omitted.) This case does not concern assessor's maps adopted under former Political Code section 3658, nor the sufficiency of an assessor's map where no survey has been completed. (*Smith, supra,* 158 Cal. at p. 705.) As we have explained, the location of Lot 18 can be ascertained by referring to the assessor's map.

16

Finally, we reject the Cafferkeys' claim that the court erred by granting the City's motion for summary judgment because "there is a question of fact as to the authenticity of the . . . assessor's maps, and whether they are indeed separate from recorded parcel maps." To support this argument, the Cafferkeys rely on excerpts from Thomas's deposition where he stated the "[a]ssessor's maps reflect the intent of the taxpayer[,]" the Assessor-Recorder creates maps "'off of'" parcel maps recorded by the taxpayer, and that he "believe[d]" assessor's maps and parcel maps "are the 'same thing.'" Thomas's deposition testimony does not create a material issue of fact. Thomas's explanation of the Assessor-Recorder's practice and the general similarities between assessor's maps and parcel maps does not demonstrate the Assessor-Recorder did not comply with section 327 when it described Lot 18 on the assessor's maps.

We conclude the court properly granted the City's motion for summary judgment and denied the Cafferkeys' motion. The Assessor-Recorder created Lot 18 pursuant to its authority under section 327 and the Cafferkeys have failed to raise an issue of fact as to whether the assessor's maps comply with that statute. Accordingly, the taxes for Lot 18 were not "[e]rroneously or illegally collected" (§ 5096, subd. (b)) and the Cafferkeys are not entitled to a tax refund. Having reached this result, we need not consider the parties' remaining arguments.

DISPOSITION

The judgment is affirmed. The City and County of San Francisco is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

17

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Bruiniers, J.

A140752

18

Superior Court of the County of San Francisco, No. CGC-11-515538, Leslie C. Nichols, Judge.

Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Jeffrey H. Lowenthal and Michelle Akerman, for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Jean Alexander, Chief Tax Attorney, Carole F. Ruwart, Thomas S. Lakritz, Deputy City Attorneys, for Defendant and Respondent.

A140752